UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RESTAURANT SUPPLY, LLC                              CIVIL ACTION

V.                                                  NO. 17-8793

PRIDE MARKETING AND                                 SECTION "F"
PROCUREMENT, INC.

ORDER AND REASONS

Before the Court is the plaintiff's motion for partial summary judgment. For the following reasons, the motion is DENIED.

**Background**

A buying group gathered together suppliers and dealers so it could make bulk purchases from vendors on behalf of those suppliers and dealers. The bulk purchasing allowed the buying group to gain advantageous pricing from the vendors, resulting in substantial discounts and rebates, which were paid to the suppliers and dealers in exchange for joining the buying group. The buying group is organized as a cooperative for tax purposes, and can receive favorable tax treatment for revenue that is passed on to its members as patronage dividends. In 2015 and 2016, the buying group refused to remit the rebates to its members. Now, a member and the buying group dispute whether the buying group's status as a cooperative, and the relevant provisions of the corporate governance agreement, obligate the buying group to remit the withheld rebates.

1

Pride Marketing and Procurement, Inc. is a food service and equipment buying group that makes bulk purchases from vendors on behalf of suppliers and dealers. Each supplier and dealer owns one share in the buying group. The Shareholders receive rebates that are determined by the purchases each Shareholder makes. Restaurant Supply was a Shareholder of Pride from 2006 until May 2016. In March 2016, Pride representatives unexpectedly informed Restaurant Supply, among others, that Pride would not and could not pay its rebates for 2015 and 2016, which exceed $2 million dollars.[1] Restaurant Supply sued Pride on June 28, 2016, seeking to recover the $2 million in rebates Pride refused to remit.

Restaurant Supply initially sued Pride in Connecticut state court on June 28, 2016, seeking to recover the $2 million in

---

[1] Pride had used the rebates to secure the debt of a third party, FoodServiceWarehouse.com, and when FSW defaulted on its loan, the bank had seized the rebates. FSW was formed in 2006 as an internet-based e-commerce business that purchased bulk food service equipment and supplies, stored the inventory, and then distributed it to retail internet buyers. FSW was a Shareholder of Pride, and several of Pride's directors served on FSW's governing management committee. In 2015, IberiaBank issued a $21 million line of credit to FSW; Pride guaranteed $15 million of FSW's obligation. In February 2016, Pride made a $4 million payment to IberiaBank under its guarantee. On March 9, 2016, the bank offset $9.8 million that Pride held in various deposit accounts, which the bank applied to FSW's outstanding debt. On March 11, 2016, IberiaBank issued a Notice of Default of FSW and accelerated the remaining debt due. Pride immediately paid $4 million to extinguish and satisfy its guaranty of the FSW debt. Pride also made substantial payment to FSW's vendors for product purchased by FSW utilizing Pride's authorization codes. On May 20, 2016, FSW filed Chapter 11 Bankruptcy.

rebates Pride refused to remit. It was removed to the United State District Court for the District of Connecticut, then transferred to this Court on August 31, 2017. Restaurant Supply alleged several causes of action, including breach of contract. On May 15, 2018, Restaurant Supply moved for partial summary judgment on its breach of contract claim. Pride opposed the motion on May 22, 2018.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or

depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Id. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d

824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

## II.

### A.

Pride is organized as a cooperative under the Internal Revenue Code. 26 U.S.C. § 1381, *et seq*. Restaurant Supply contends that Pride's status as a cooperative, and the relevant provisions of the By-Laws organizing it as such, imposes a contractual obligation on Pride to pay the rebates for 2015 and 2016.[2] Because it failed to pay the rebates, the plaintiff asserts, Pride has breached its contractual obligations. Before fully addressing Restaurant Supply's contentions, and Pride's response, a review of the relevant federal tax laws and regulations, state law, and the pertinent corporate governance documents is needed.

An organization operating as a cooperative may qualify for tax treatment under Subsection T of the Internal Revenue Code. 26 U.S.C. § 1381. The benefit of organizing as a cooperative is that the organization can exclude amounts paid as patronage dividends from its taxable income. 26 U.S.C. § 1382(b). A patronage dividend

---

[2] Restaurant Supply raised this argument in its opposition to Pride's Rule 12(c) motion to dismiss. In a footnote, the Court acknowledged Restaurant Supply's argument, but concluded that the Court could resolve the issues presented by considering the terms of the Shareholder Agreement, and declined to reach Restaurant Supply's cooperative argument.

is "an amount paid to a patron by an organization . . . (1) on the basis of quantity or value of business done with or for such patron, (2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and (3) which is determined by reference to the net earnings of the organization from business done with or for its patrons." 26 U.S.C. § 1388(a). Said another way, the United States Tax Court has defined patronage dividends as "an amount that is allocated or paid to a patron out of the net earnings of the cooperative from business done with or for its patrons and that is based upon the quantity or value of business done with or for the patron, under a preexisting obligation to pay such amount." Buckeye Countrymark, Inc. v. C.I.R., 103 T.C. 547, 555 (1994). Net earnings, from which the patronage dividends are paid, are revenues minus expenses.[3] 26 C.F.R. § 1.1388-1(a). Additionally, provisions in the cooperative's bylaws or articles of incorporation may constitute a preexisting obligation. 26 C.F.R. § 1.1388-1(a). Finally, the patronage dividend must be

---

[3] Treasury Regulation § 1.1388-1(a)(Example 3) provides a helpful illustration of patronage dividends: "Cooperative C, a purchasing association, obtains supplies for patron Y on May 1, 1964, and receives in return therefor $100. On February 1, 1965, cooperative C, having determined the excess of its receipts over its costs and expenses, pays to Y a cash distribution of $1.00 and a revolving fund certificate with a stated dollar amount of $1.00. The amount of patronage dividend paid to Y in 1965 is $2.00, the aggregate of the cash distribution ($1.00) and the stated dollar amount of the revolving fund certificate ($1.00)."

6

distributed no later than eight and a half months following the taxable year that the patronage dividends were generated. 26 U.S.C. § 1382(d).

Although Subchapter T creates obligations for a cooperative that involve certain treatment to its patrons, such as distributing dividends pursuant to a preexisting obligation, it does not control their contractual obligations towards each other. See United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985) (quoting Aquilino v. United States, 363 U.S. 509, 513 (1960)("In the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property."). "This follows from the fact that the federal statute 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'" United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985) (quoting United States v. Bess, 357 U.S. 51, 55 (1958)). Accordingly, Louisiana law still controls the contractual obligations between Restaurant Supply and Pride, but Subchapter T may be useful in informing the context of their contractual provisions relating to patronage dividends.

B.

Restaurant Supply contends, and Pride does not dispute, that Pride held itself out and elected to be taxed as a cooperative under the Internal Revenue Code. Restaurant Supply asserts that to

7

be a cooperative, Pride must have been bound by a legal obligation to pay patronage dividends. Both parties agree that Section 10.2 of Pride's Amended and Restated By-Laws is the relevant and controlling provision. Section 10.2 of Article X provides:

> **There shall be distributed, on a patronage basis to such Shareholders of the Corporation** in a manner taking into account the amount of business done by the Corporation with each of them, **all the net savings** and overcharges effected by or resulting from the operations conducted and carried on by the corporation in connection with the sale of equipment and supplies made by the corporation to such Shareholders for resale by them **which remain after paying all operating and administrative expenses of the corporation** and all interest on its indebtedness and after the setting aside by the Directors of such reasonable reserves as they shall determine from time-to-time to be appropriate for the purpose of providing for the expectancy of PRIDE and for the purpose of providing for the expectancy of any losses or contingencies. Said distributions shall be made no later than eight and one half (8 1/2) months following the close of the year of the Corporation during which the patronage occurred with respect to which each such distribution is made. . . ."

(Emphasis added). Restaurant Supply contends that the Section 10.2 requirement that Pride pays Shareholders "all net savings" encompasses rebates, and therefore obligates Pride to remit all rebates. Section 9.1 of the By-laws provides that "[t]hese by-laws . . . shall constitute a binding contract between the corporation and its Shareholders." Restaurant Supply argues that because Section 10.2 requires that Pride pay Restaurant Supply its rebates, and Section 10.2 is a binding contract, Pride has breached its contractual obligations.

Pride contends that it is not obligated to remit all of the rebates as patronage dividends, but only the net earnings, which does not necessarily include the rebates. In support of its position, Pride submits an expert report by an accountant that specializes in cooperatives. The report explains the way Pride accounted for its revenues, rebates, and expenses. According to the report, Pride entered into purchasing contracts with restaurant supply and equipment manufacturers and vendors that allowed Pride's Shareholders to purchase products at a discount. The Shareholders would either purchase directly from the manufacturer or vendor, or through Pride's procurement system. The manufacturers and vendors paid Pride a management fee of 1% of their total volume of sales. Pride also received revenues from Shareholders and manufacturers and vendors for services it provided related to marketing and tradeshows. The revenues earned from the fee and the additional services it provided were allocated to the general purchasing pool. Typically, the balance of the general purchasing pool was sufficient to cover Pride's operating and overhead costs in a typical year, so all operating costs were charged to that account. Pride would occasionally make minor patronage distributions from the general purchasing pool.

Pride also received rebates from manufacturers when its Shareholder patrons exceeded certain purchasing minimums set by the manufacturer. Each manufacturer and vendor had different

criteria for generating rebates and the Shareholders would purchase from vendors in various amounts, so Pride created a different patronage allocation unit for each vendor and manufacturer, about 150 accounts. When the manufacturers and vendors generated the rebates, Pride would allot the amounts to the appropriate patronage allocation unit, then Pride's accounting team would assess their accuracy, and typically distribute all of the generated rebates to the Shareholder patrons, based on the purchases the Shareholders made.

As the Court has noted in prior decisions, Pride sustained significant losses when it guaranteed the debt of one of its Shareholders, FSW, in 2015. Pride did not have sufficient funds in its general allocation pools, or other accounts, to cover all of the losses. According to the accounting information presented in the expert report, Pride had $15.4 million in excess losses allocated to the general pool in 2015. Pride allocated this loss to vendor rebate pools in 2016. The rebates generated by the manufacturers and vendors based on the purchases made by the Shareholder patrons were applied to this loss, and not distributed to the Shareholders as they historically had been. The accountant's report opines that this practice is typical among cooperatives; when cooperatives are successful, they will pass along all rebates, but when they are operating at a loss, they offset their costs with the patronage earnings.

Pride contends that the language of Section 10.2 of Article X allows it to apply its losses to its vendor accounts, and therefore rebates, because the provision only obligates Pride to remit "the *net* savings . . . which remain after paying *all operating and administration expenses*." It contends that it is required to distribute revenue, including rebates, less any operating expenses, administrative expenses, interest, reasonable reserves, and loss contingencies to its Shareholders on a patronage basis. It asserts that it complied with this obligation in 2015 and 2016. Pride maintains that its obligations to Restaurant Supply are governed by state law, but points out that Section 10.2 is consistent with the Subsection T requirements. Specifically, that Subsection T does not require cooperatives to distribute all revenue generated by patrons, just amounts derived from net earnings, defined as revenues less expenses.

C.

Because Louisiana law controls ownership interests, not federal tax law, the Court's consideration of whether Section 10.2 of the Pride By-laws vests in Restaurant Supply an ownership interest in the rebates is guided by Louisiana contract principles.[4] The Louisiana Civil Code mandates that the "[i]nterpretation of a contract is the determination of the common

---

[4] Contrary to what has been asserted, federal tax law at best animates this dispute. It does not determine its outcome.

intent of the parties." La. Stat. Ann. § 2045. But the Court may not look outside the terms of the contract to determine the parties intent if the contract itself is "clear and explicit and lead[s] to no absurd consequences." La. Stat. Ann. § 2046. Moreover, the Court must interpret each provision in a contract "in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Stat. Ann. § 2050.

Pride does not dispute that it owes Restaurant Supply patronage dividends based on "net savings." But it does dispute that net savings unequivocally includes all rebates. The Court agrees. First, the language of Section 10.2 makes clear that only amounts "which remain *after* paying all operating and administrative expenses" are available for distribution. Second, the word "net" used as an adjective to modify any amount or value unilaterally refers to the amount remaining after deductions for expenses or contributions have been made.[5] Additionally, one should note that "net earnings" means revenues less expenses. Common sense, and the Treasury Regulations, dictate this result. Restaurant Supply offers no reasoning as to why "net savings" includes all rebates received <u>without</u> reduction. It is clear that

---

[5] See OXFORD DICTIONARY, *Net,* https://en.oxforddictionaries.com/definition/net#h46970728457800 (last visited June 24, 2016)("(of an amount, value, or price) remaining after the deduction of tax or other contributions"); *Net*, BLACK'S LAW DICTIONARY (10th ed. 2014)("An amount of money remaining after a sale, minus any deductions for expenses, commissions, and taxes.").

12

Louisiana law and the context in which Section 10.2 was drafted (and lastly, the relevant Regulations about patronage dividends), that Pride is only obligated to distribute revenues less expenses on a patronage basis.

Because Restaurant Supply has not shown that Pride was contractually obligated to remit the rebates after "net savings," the Court cannot grant summary judgment on its breach of contract claims because the plaintiff failed to establish an essential element of its claim. However, the Court stops short of holding the Section 10.2 does not require Pride to remit rebates. It is not clear on the record,[6] and the plaintiff failed to adequately brief,[7] whether Section 10.2 permits Pride to offset the losses it sustained from guaranteeing one of its shareholder's debt against all of its vendor accounts.

Accordingly, IT IS ORDERED: that the plaintiff's motion for partial summary judgement is DENIED.

---

[6] The Court did not identify, and the parties did not submit, any regulatory guidance or case literature that clarifies whether a cooperative is permitted, as a matter of law, to reduce revenues by losses accrued from guaranteeing the debt of one patron. Pride submitted two expert reports, one by an attorney specializing in cooperatives, and one by an accountant, that both implied that Pride's actions were appropriate.

[7] The plaintiff briefly states that it "vehemently dispute[s]" that Pride may offset the FSW losses against the vendor rebates, but does not provide any support. Moreover, it states that the "quantum of net savings and expenses is beyond the scope" of this motion.

New Orleans, Louisiana, June 27, 2018

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE