RESTAURANT SUPPLY, LLC                     CIVIL ACTION

V.                                         NO. 17-8793

PRIDE MARKETING AND                        SECTION "F"
PROCUREMENT, INC.

## ORDER AND REASONS

Before the Court is the defendant's motion for summary judgment. For the following reasons, the motion is GRANTED as to the plaintiff's claim for equitable accounting, DENIED as to its claims for conversion and breach of contract, and DENIED as to its claims for fiduciary duty and the duty of loyalty, and negligence.

## Background

Pride Marketing and Procurement, Inc. is a food service and equipment buying group that was established in 1989. Pride is a consortium of food service wholesale suppliers and dealers engaged in the business of buying and selling food service supplies and equipment products. Each supplier and dealer owns one share in the buying group. Pride uses the collective purchasing strength of its Shareholders to negotiate advantageous pricing from food service suppliers and equipment manufacturers, referred to as Pride Vendors. The Shareholders would either purchase directly from the manufacturer or vendor, or through Pride's procurement system. The manufacturers and vendors paid Pride a management fee of 1% of

their total volume of sales.[1] Pride also received rebates from manufacturers when its Shareholder patrons exceeded certain purchasing minimums set by the manufacturer. Typically, Pride would redistribute the rebates, also referred to as patronage dividends, to the Shareholders in the amount that each one earned. Pride is organized as a cooperative for tax purposes, and is obligated by its By-Laws to remit the rebates less expenses and losses to its Shareholders.

In March 2016, Pride representatives informed its Shareholders that Pride would not and could not pay its rebates for 2015 and 2016 because it sustained significant losses after guaranteeing the debt of FoodServiceWarehouse.com. FSW was formed in 2006 as an internet-based e-commerce business that purchased bulk food service equipment and supplies, stored the inventory, and then distributed it to retail internet buyers. Pride Shareholders voted to form FSW because many of the Shareholders operated physical storefronts and could not capture internet sales. At formation, all Pride Shareholders became members of FSW. Additionally, FSW became a member of Pride. This benefited Pride Shareholders because FSW's substantial purchasing volume allows

---

[1] Pride also generated income from services it provided related to marketing and tradeshows. Altogether, this income typically covered Pride's operating expenses.

Pride to negotiate better contracts with vendors, resulting in more favorable pricing.

As FSW continued to grow, it needed capital to support its rapid expansion, and obtained a line of credit from Iberia Bank. FSW initially established a $2 million line of credit in August 2012, but increased the line to $21 million over a three-year period. FSW requested that Pride guarantee the line of credit, and with the approval of its Board of Directors, Pride guaranteed $15 million. Simultaneously, FSW was seeking a larger debt instrument from JP Morgan Chase, which was intended to continue to fund its expansion and would satisfy the Iberia line of credit. When that funding was delayed, FSW obtained private loans, including a $1 million loan from Joseph Sullo, the sole member of Restaurant Supply, another Pride Shareholder. FSW members were notified in February 2016 that the JP Morgan debt instrument would not be accessible until April 2016, at the earliest, and that FSW was experiencing severe cash flow issues.[2] In late February 2016, Pride made a $4 million dollar payment to Iberia Bank in the hope that FSW could obtain additional time to work through some of its issues. Weeks later, Iberia swept Pride's bank accounts, taking all of the funds therein, including Pride's operating, rebate, and

---

[2] Sullo visited FSW's offices several times to help with their operating and financial issues, which eventually led to discussions of a possible merger between FSW and Restaurant Supply.

3

procurement funds, totaling $9.8 million. On March 11, 2016, IberiaBank issued a Notice of Default of FSW and accelerated the remaining debt due. Pride immediately paid $4 million to extinguish and satisfy its guaranty of the FSW debt. On May 20, 2016, FSW filed Chapter 11 Bankruptcy.

Immediately after the Iberia sweep, the Pride Board of Directors organized a series of calls on March 17, 2016 to inform Shareholders as to what had happened and how they would go forward. During these calls, Pride informed Shareholders that they would not be receiving payments of the remaining 2015 rebates, but that Pride intended to pay these rebates in the future.

On March 21, 2016, shortly after receiving notice that Pride would not remit rebates to its Shareholders, Restaurant Supply sent a letter to Pride demanding all rebates "due and owing." Restaurant Supply was a Shareholder of Pride from 2006 until May 2016. Over that period, Restaurant Supply made over $50 million dollars in purchases. It asserted a right to $2 million in rebates it had accrued from its purchases in 2015 and 2016. In the letter, it stated that it would be "ceasing all purchasing procurements through PRIDE," effective immediately. Shortly thereafter, Pride Board of Directors learned that Restaurant Supply joined a competitive buying group. Deciding that Restaurant Supply's decision to cease purchases and join a competitor would be detrimental to the interest of Pride, the Pride Board of Directors

voted to terminate Restaurant Supply's interest in Pride, thereby withdrawing its status as a Shareholder.

Restaurant Supply initially sued Pride in Connecticut state court on June 28, 2016, seeking to recover the $2 million in rebates Pride refused to remit. It was removed to the United State District Court for the District of Connecticut, then transferred to this Court on August 31, 2017. In its amended complaint, Restaurant Supply alleged the following causes of action: (1) equitable accounting; (2) conversion; (3) unjust enrichment; (4) breach of fiduciary duty and the duty of loyalty; (5) breach of contract; and (6) negligence. In its April 25, 2018 Order and Reasons, the Court granted Pride's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c) as to the unjust enrichment claims, and denied the motion as to all other claims.[3] On June 27, 2018, the Court denied Restaurant Supply's motion for partial summary judgment[4] and denied Pride's motion for sanctions under

---

[3] Additionally, on May 30, 2018, the Court denied Pride's motion to amend and certify the April 25, 2018 Order and Reasons as immediately appealable pursuant to 28 U.S.C. § 1292(b) and to stay the proceedings.

[4] Restaurant Supply moved for partial summary judgment on its breach of contract claim, contending that Pride's status as a cooperative obligates it to pay patronage dividends. The Court held that although Pride's By-Laws obligate it to pay patronage dividends, it is only obligated to distribute revenues less expenses on a patronage basis.

Rule 37, or in the alternative, motion for partial summary judgment.[5] On May 29, 2018, Pride moved for summary judgment.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he

---

[5] Although styled as a motion for sanctions or a motion for partial summary judgment, Pride's motion was functionally a motion *in limine* seeking to bar evidence of damages beyond what was claimed or produced in discovery. The Court denied the motion because there was no basis to believe that Restaurant Supply was contemplating introducing such evidence, and had assured Pride on the record that it would not.

must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. <u>Id.</u> Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." <u>Hathaway v. Bazany</u>, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. <u>Id.</u> at 249 (citations omitted); <u>King v. Dogan</u>, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of

contradictory facts." <u>Antoine v. First Student, Inc.</u>, 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).


II.

As the Court has acknowledged in prior decisions, the core issue in which Restaurant Supply's claims turn on is whether Restaurant Supply or Pride owns the rebates. The corporate governance documents have guided the inquiry. The relevant corporate government documents are: (1) the Amended and Restated Shareholder Agreement; (2) the First Amendment to the Pride Amendment to the Amended and Restated Shareholder Agreement; and (3) the By-Laws. The Amended and Restated Shareholder Agreement is a contract between Pride and the individual Shareholders. The First Amendment modifies the Shareholder Agreement by its terms, and was also adopted by the individual Shareholders. The Shareholder Agreement and the First Amendment govern the relationship between Pride and Restaurant Supply, and was addressed in the Court's April 26, 2018 Order and Reasons. The By-Laws govern Pride, but also provide Shareholders a potential claim to rebates remitted as patronage dividends. The Shareholders' rights to patronage dividends created by Article X of the By-Laws were addressed in the Court's June 27, 2018 Order and Reasons. Accordingly, the Court has acknowledged two potential theories under which Restaurant

Supply could demonstrate that it is entitled to the rebates Pride refused to remit: (1) the Shareholder Agreement and the First Amendment and (2) the By-Laws. The Court will address both in turn, beginning with the Shareholder Agreement and the First Amendment. First, a review of those documents and the Court's initial interpretation of their contents is helpful.

A.

The Court's April 26, 2018 Order and Reasons was largely devoted to determining the provisions of the Shareholder Agreement and the First Amendment and whether the provisions unambiguously demonstrated the parties' intent. Considering only the four corners of the contract, the Court determined that the agreement was "hopelessly ambiguous."

Section 9.01 of the Shareholder Agreement is entitled "VENDOR REBATES." It reads, "The Vendor Rebates paid by a PRIDE Vendor to Pride for Product Purchases shall be an obligation *due and owing* by PRIDE, and therefore will be paid to the Shareholder for which the product was purchased and subsequently sold to . . . ." The Shareholder Agreement made clear that Pride was contractually obligated to pay the Shareholders, including Restaurant Supply, the rebates they earned based on their purchases. It is uncontested that the First Amendment deleted this provision, and replaced it with the following:

PRIDE and the Shareholder stipulate and agree that:

A. The Vendor Rebates are the result of:

(1) Product purchases made by PRIDE for the individual Shareholder and the Authorization Code Purchases for which PRIDE has become liable;

(2) Marketing agreement which PRIDE has made with Preferred Vendors.

. . .

C. The Shareholders stipulate and agree that **the Vendor Rebates are and shall remain the exclusive property and funds of PRIDE**, and the Shareholders have no legal, equitable, or any other interest or claim whatsoever in and to the Vendor Funds except that PRIDE **may** release and distribute any funds resulting from rebates in excess of the amount owed by a Shareholder to PRIDE, as in conformance with paragraph 9.01(D) of the Shareholder Agreement.

D. The PRIDE Board of Directors may, at its option and sole discretion, declare and distribute a Marketing Distribution to a Shareholder out of a portion of the Vendor Rebates paid to PRIDE by the PRIDE Vendors, based upon the purchasing activity of each Shareholder, by the affirmative vote of a majority of the PRIDE Board of Directors, less the amount of any outstanding and unpaid invoices for Authorization Code Purchases or other obligations owed to PRIDE by a Shareholder in excess of the Letter of Credit and/or the other Collateral.

(Emphasis added). The language of the amended Section 9.01 explicitly vests the ownership of the rebates in Pride.

But Section 9.01 is not the only provision in the Shareholder Agreement that addresses the rebates. Section 3.02 of the Shareholder Agreement is entitled, "SECURITY INTEREST AND RIGHT OF SETOFF AGAINST REBATES" and provides the following:

A. As set forth and provided in Article VII of the PRIDE By-Laws, **PRIDE has an absolute and irrevocable security interest and right of set-off against all funds** in its

possession or under its control, belonging to a Shareholder, **including rebates** and refunds paid or to be paid from the Vendor to PRIDE and by Pride to the Shareholder, in connection with Product Purchases (*the "Vendor Rebates"), to secure and satisfy any and all indebtedness and other obligations owed to PRIDE by the Shareholder, including without limitation the amount due PRIDE by the Shareholder for Authorization Code Purchases for which PRIDE is liable to the Vendor. . . .

B. The Shareholder stipulates and agrees that PRIDE, in its sole discretion, and **in order to protect its right of setoff and security interest in the rebates** and refunds paid or to be paid from the vendor, may withhold and suspend the payment of any Vendor Rebates which may be in the possession or under the control of PRIDE, and may be owed to the Shareholder by PRIDE for Product Purchases, until such time as the outstanding balance due and owing to PRIDE by the Shareholder . . . shall be reduced to an amount due and owing to PRIDE which may be satisfied by the balance of the Shareholder Letter of Credit . . . .

(Emphasis added). Section 3.02 was amended by the First Amendment, but its unartful drafting prompted a dispute between the parties as to whether 3.02(B) was preserved by the First Amendment. The Court determined that if 3.02(B) was included, it would create an ambiguity in ownership rights, because if Pride had a security interest in the rebates, then it could not own them. Louisiana law does not permit the Court to look outside the terms of the contract to determine the parties intent if the contract is "clear and explicit and lead[s] to no absurd consequences." La. Stat. Ann. § 2046. Accordingly, the Court could only initially consider the text of the First Amendment to determine if Section 3.02(B) was included in the amendment.

The First Amendment is divided into two sections. The first provides background of the role of the Shareholder agreement and the relationship between the Shareholders and Pride generally. The second provides the amendments. The introductory paragraph to the second section states, "the PRIDE Shareholder Agreement be and the same is hereby amended to add the following." Three sections follow: Section 1 amending Section 3.01, Section 2 amending Section 3.02, and Section 3 amending Section 9.01. Section 2 provides:

By amending Section 3.02, entitled "Security Interest and Right of Setoff Against Rebates", to read as follows:

"3.02 <u>SECURITY INTEREST AND RIGHT OF SETOFF</u>

A. As set forth and provided in Article VII of the PRIDE By-Laws, PRIDE has an absolute and irrevocable security interest and right of set-off against all funds in its possession or under its control, belonging to a Shareholder to secure and satisfy any and all indebtedness and other obligations owed to PRIDE by the Shareholder, including without limitation the amount due PRIDE by the Shareholder for Authorization Code Purchases for which PRIDE is liable to the Vendor. . . .

The amended 3.02(A) simply removes the phrase in the original 3.02(A) that references rebates. No other changes are made to the provision. The phrase "read as follows" when referring to Section 3.02 in its entirety indicates that the amended section replaces all of Section 3.02. But the Court concluded that the amended Section 3.02 did not delete subsection B for two reasons. First, the First Amendment still designates the provision as subsection

"A." Nowhere else in the Shareholder agreement or the First Amendment is there a subsection "A" without a "B" to follow it. In sections with only one provision, the text always begins immediately following the title. The Court expressed discomfort with interpreting the amended Section 3.02 to only include subsection A because the interpretation would be inconsistent with the format embraced in every other provision of the contract and its amendment. Second, the First Amendment used other language elsewhere when it intended to delete an entire section. It pointed to Section "3" of the First Amendment, which begins by stating, "By amending Section 9.01 with the **deletion** of the existing Section 9.01 and amending it to read as follows." (Emphasis added). Section 3.02 does not mirror that language. The Court concluded that the First Amendment does not entirely replace Section 3.02, but only amended Section 3.02(A). The First Amendment did not delete Section 3.02(B).

Additionally, the Court determined that Section 8.03 further contributed to the confusion. Section 8.03, which the First Amendment left untouched, provides, "The Shareholder agrees that PRIDE may set off . . . any balance which may be due and unpaid by the Shareholder to PRIDE . . . from any amounts which *may be otherwise payable to the Shareholder by PRIDE for rebates*, refunds or any other source, to . . . satisfy the indebtedness or

obligation due PRIDE."[6] The Court determined that Sections 3.02(b), 8.03, and 9.01 were conflicting and therefore held that the Shareholder Agreement and the First Amendment were ambiguous on the issue of intent. The Court refrained from determining intent at the pleading stage, see Abdul-Alim Amin v. Universal Life Ins. Co. of Memphis, Tenn., 706 F.2d 638, 641 (5th Cir. 1983), but did conclude that Restaurant Supply had pled sufficient allegations to survive the motion to dismiss.

B.

Both parties agree that Louisiana law governs this dispute. The Court's approach to a contract's meaning is driven by simple common sense principles. The Court's role in interpreting contracts is to determine "the common intent of the parties." La. Civ. Code art. 2045. In determining common intent, pursuant to Civil Code article 2047, words and phrases are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. See Henry v. South Louisiana Sugars Co-op., Inc., 957 So.2d 1275, 1277 (La. 2007). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent" (La. Civ. Code art. 2046),

---

[6] Notably, the provision states that the rebates "may" be payable to the Shareholders, not that they are "due and owing," or that Pride is otherwise legally obligated to remit the rebates.

and the agreement must be enforced as written. <u>Hebert v. Webre</u>, 982 So.2d 770, 773-74 (La. 2008). If, as here, the contract is ambiguous, the Court may consider extrinsic evidence as to the parties' intent. <u>Campbell v. Melton</u>, 817 So.2d 69, 75 (La. 2002). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code art. 2053. Ambiguous terms should be construed against the drafter. La. Civ. Code art. 2056.

C.

For the first time, the Court is made aware of the context surrounding the adoption of the First Amendment. Pride has submitted substantial evidence supporting its contention that the First Amendment was intended to unequivocally vest ownership of the rebates in Pride, and Restaurant Supply has failed to submit any competent evidence to show otherwise.

In her deposition, Karin Sugarman, Pride's CEO, spells out the three ways in which a Shareholder could make purchases, termed (1) marketing, (2) centralized pay, and (3) procurement. Marketing allowed the Shareholder to issues a purchase order directly to the vendor.[7] The vendor would fulfill the purchase order, and the

---

[7] The Court uses the term "vendor" for consistency, and it refers to the third parties that would sell the Shareholders products

Shareholder would pay the manufacturer directly. The second type, called centralized pay, allowed the Shareholder to send a purchase order to the vendor, then the vendor would direct the invoice to Pride. The Shareholder would also receive a copy of the invoice. The Shareholder would pay Pride, and Pride would pay the vendor. But Pride would not guarantee the payment. This is the distinguishing characteristic between the third type of purchasing, which used a procurement agreement. Again the Shareholder would issue a purchase order to the vendor, but it would provide the vendor with an authorization code, which it would enter into the Pride portal. Pride guaranteed payment for the vendors that entered an authorization code. The vendor would fulfill the order, and send an invoice to Pride and the Shareholder. The Shareholder would pay Pride, who would pay the vendor.

Because Pride is exposed to liability to vendors if the Shareholder is unable to pay for the product it purchases because it guarantees payment, the Shareholder Agreement also requires each Shareholder to either produce a certificate of deposit or a standby letter of credit. These act as collateral for the Shareholder's purchases that Pride is obligated to pay. But many

_____

(and ultimately issue the rebates). Some record evidence refers to the Shareholders as "vendors," but for the purpose of the Court's documents, vendors refers to the third parties. The Pride Directors also refer to these third parties as manufacturers.

of Pride's Shareholders, including Restaurant Supply, were purchasing beyond the value of the collateral. As noted in prior opinions, the Shareholder Agreement unambiguously provided Pride a security interest in the undisbursed rebates in its possession, for unpaid fees and invoices. The Shareholders nonetheless owned the rebates. In 2010, well into the financial crisis, the Pride Board of Directors grew concerned that their exposure to debt on behalf of their Shareholders was too great. Specifically, they worried that if any of their Shareholders declared bankruptcy, they may not be able to perfect their security interest in the rebates or have priority over other creditors. Karin Sugarman testified that while she did not recall any specific Shareholder declaring bankruptcy, "there were several shareholders that were having financial strain," which "prompted the review into how secure PRIDE [was] with using those rebates."

To limit their exposure, the Pride Board of Directors drafted the First Amendment, which was intended to vest ownership of the rebates in Pride. They voted and approved the First Amendment, and then sought Shareholder approval. Robert Autenreith, a Pride Director, and Karin Sugarman announced the amendment in a letter sent to all Shareholders via email on October 13, 2010. It stated:

Dear PRIDE Member,

We have been "lucky" in the past with respect to using the rebates as credit for our members' procurement purchases. PRIDE, fortunately, has not incurred any bad debts due to any

one of our shareholders declaring bankruptcy or closing its' doors. But, these are different times. Due to the poor economy, the PRIDE Board of Directors has decided to insure that the PRIDE members are financially protected from any other PRIDE member going bankrupt. As a result, and in order to protect PRIDE, the Board of Directs and the PRIDE office has asked our attorneys to create an amendment to the Amended and Restated Shareholder agreement which you all have signed. The First Amendment is attached. An explanation of the First Amendment by PRIDE's attorney is immediately below.

"At its inception, the PRIDE Authorization Code approvals were limited for each Shareholder up to the amount of the letter of credit, issued in favor of PRIDE, by an individual Shareholder.

In the recent years, in order to facilitate and enhance the product purchases through PRIDE, PRIDE has begun issuing Authorization Code approvals in excess of the amount of the letter of credit for individual Shareholders, in its discretion, based upon the contemplated security of the vendor rebates which would be due to the individual shareholders. *This was initially based upon the understanding that the vendor rebates were property of PRIDE up to an amount equal to the amount of outstanding approval Authorization Code invoices and, more recently, based upon the security interest and right of offset granted in the PRIDE Shareholder Agreement as implemented in 2006.*

*However, the volume and amount of Authorized Code approvals for the Shareholders have greatly increased, thereby increasing PRIDE's reliance upon the vendor rebates for repayment.*

By allowing the Authorization Codes to be based upon the vendor rebates, PRIDE has allowed the product purchases to be significantly increased which have also greatly increased the risk to PRIDE in relying upon the vendor rebates for payment.

If a PRIDE member were to declare bankruptcy, the vendor rebates would be considered general intangibles. As a result, for PRIDE to actually perfect a security interest in the rebates and have priority over creditors, PRIDE would first have to confirm that an individual Shareholder had not previously granted a security interest to another lender, such as a bank. If a security interest had not been previously granted to PRIDE, PRIDE would then be required to have a

security agreement executed by the Shareholder and then file a financing statement in the appropriate jurisdiction, all at a significant cost to PRIDE and the Shareholders.

. . .

Based upon the foregoing, if PRIDE is to continue to issue Authorization Approval Codes based upon vendor rebates **it will have to be explicitly clear that <u>the vendor rebates are the exclusive property and funds of PRIDE</u>, with the Shareholders to have no legal, equitable, or any other interest or claim whatsoever in the rebates** except that PRIDE may release and distribute any funds resulting from rebates in the excess of the amount owed by a Shareholder to PRIDE.

Accordingly, and in order to protect the interest of PRIDE, and at the same time allow the Shareholders the enhanced ability to effect product purchases with Authorization Code purchases, you are urged to approve the proposed First Amendment to the PRIDE Shareholder Agreement which is attached and, following your vote and approval, execute and return the signature page and acknowledgement, with the acknowledgement to be executed before a notary.

Any Shareholder which does not sign the First Amendment to the PRIDE Shareholder Agreement will either have to limit its requests for Authorization Codes to the amount of its letter of credit or certification of deposit, because PRIDE will not be able to issue Authorization Codes for that Shareholder based upon anticipated vendor rebates until the First Amendment is signed and returned to PRIDE."

We will be discussing and voting on the First Amendment at the upcoming PRIDE shareholder meeting at the General Membership meeting on October 26, 2010. . . .

(Emphasis Added). Karin Sugarman testified that this email was intended to review their current practice of including rebates when calculating the total credit facilities of the Shareholders, the corporate exposure that practice created, and to notify the Shareholders that the First Amendment would be discussed at the

October 26, 2010 meeting. She testified that the letter and the First Amendment reflected Pride's need "to own th[e] rebates in order . . . to allow the shareholders greater purchasing power."

Pride submits evidence demonstrating that the Pride Shareholders understood the First Amendment as giving Pride ownership of the rebates. Shareholder's Minutes from Pride's October 26, 2010 Shareholder Meeting reflect that the Shareholders discussed the First Amendment and elected to allow Shareholders to individually adopt the amendment on a voluntary basis. Ultimately, the Shareholders could either elect to adopt the First Amendment, which would vest ownership of the rebates in Pride but allow the Shareholder to continue to make purchases greater than the collateral it had posted, or it could refuse to sign the First Amendment and make purchases within its credit limits. However, the Shareholders would not uniformly adopt the First Amendment. According to Sugarman's testimony, several Shareholders objected to the First Amendment because they were unhappy with the change of ownership. Some refused to sign the agreement "because they would not agree to have PRIDE own rebate[s] generated from their purchases."

Pride submits the affidavits of the owners and operators of four Shareholders that attended the October 26, 2010 meeting. All four state that they understood from the language of the First Amendment that Pride would own the rebates. Shaleen Tillman, the

owner and operator of Pride-Shareholder Waco Hotel Supply testified that "[i]t was understood from the language of the document that by signing the First Amendment a Shareholder signed away its rights to its rebates and left distributions up to PRIDE in good faith." She stated that "[i]t was also evident from the discussion on the floor—at the Shareholder conference at the time of the vote on the First Amendment—that the amendment would mean PRIDE owned the above-described rebates." Gary Thaikos, the owner and operator of Zepole Restaurant Supply Co., stated in his sworn affidavit that "[i]t was understood from the language of the document that by signing the First Amendment a Shareholder signed away its rights to its rebates and left distributions up to PRIDE in good faith." Darren Anderson, the former president of PrimeSource FoodService Equipment, Inc., refused to sign the First Amendment. He stated in his sworn affidavit that "[g]enerally, in all PRIDE agreements I was unhappy with the broadly constructed language regarding control over rebate ownership, and the latitude with which PRIDE management was given regarding the disbursement of funds." He understood that "[t]he purpose of the amendment was to give PRIDE ownership of the rebates," which would "give the PRIDE management unlimited control of the rebates" and leave "distribution up to PRIDE in good faith." Anderson stated that "[t]he intent of the amendment" prompted him "to refrain from signing th[e] First Amendment . . . on behalf of PrimeSource."

Joseph Sullo attended the October 26, 2010 Shareholder meeting where the Shareholders debated the First Amendment. When testifying as to his experiences in signing Pride documents, he stated that he never refused to sign anything Pride gave him and that he never asked why he had to sign certain documents. He stated that at the October 26, 2010 meeting, everyone was signing the document,[8] and felt that he should too.[9] Sullo agreed to the First Amendment on Restaurant Supply's behalf on December 2, 2010. He testified that he did not speak with anyone at Pride before he signed it, nor did he ask any attorney to review it. Incredibly, he stated during his deposition that he did not read the First Amendment before he signed it, and had still not read it. The deposition took place on May 1, 2018, nearly two years after this litigation began. When asked who owned the rebates, he stated that "[t]he dealer owned the rebates, as far as I know." When asked what he based that belief on, he replied "[b]ecause that's just

---

[8] It is not clear exactly what was signed at the Shareholder Meeting, except that it was some document adopting the First Amendment. The meeting minutes and the record testimony make clear that after the Shareholders agreed to adopt the First Amendment on a voluntary basis, the First Amendment was sent to the individual Shareholders with a request for returning the signed document no later than November 15, 2010. Shareholders did not execute the First Amendment at that meeting.
[9] Sullo did testify that he felt pressured to sign the First Amendment and that Pride was not amenable to criticism about the document. However, he did note that he knew at least one other Shareholder who refused to sign the First Amendment, but he did not ask why.

what -- when you – you did the purchases, you got the rebate on your purchases." He also testified that he never spoke with anyone at Pride as to who owned the rebates. Sullo noted that Pride typically paid the rebates in a "timely" fashion, but that he was not aware of any specific deadlines that the rebates were due to the Shareholders.

Together the testimony of Sugarman and Sullo, the letter to Shareholders introducing and explaining the First Amendment, and the affidavits of Shareholders that attended the October 26, 2010 meeting demonstrate that both Pride and the Shareholders understood that the First Amendment intended to vest ownership of the rebates in Pride. Section 9.01 of the First Amendment states that "[t]he Shareholders stipulate and agree that the Vendor Rebates are and shall remain the exclusive property and funds of PRIDE, and the Shareholders shall have no legal, equitable, or any other interest or claim whatsoever in and to the Vendor Rebates . . . ." The letter in the October 13, 2010 emails also states, "it will have to be explicitly clear that the vendor rebates are the exclusive property and funds of PRIDE, with the Shareholders to have no legal, equitable, or any other interest or claim whatsoever in the rebates." Several other Shareholders who attended the meeting, alongside Sullo, testified that it was clear from both the language of the First Amendment and the discussion at the Shareholder meeting that the First Amendment operated as an

agreement to give Pride ownership of the rebates. Additionally, all parties agree that the Shareholder Agreement, before it was amended by the First Amendment, gave Pride a mere security interest in the rebates. It would be unusual for Pride to draft an amendment, obtain the approval of the Board of Directors, obtain the approval of the Shareholders, and alter the Shareholder's purchasing power based on whether they executed the amendment if it was intended to merely maintain the status quo.

The depositions, affidavits, corporate governance documents, and the business model itself make clear that the typical practice was that Pride would remit rebates to its Shareholders. In all years except part of 2015 and 2016, Pride remitted the rebates—if it did not, there would be little incentive for its Shareholders to remain members. But the question before the Court is whether Pride was legally obligated to remit rebates under the terms of the Shareholder Agreement and the First Amendment. Based upon this Court's review above, the answer is simply no. Sullo's testimony that he never read the First Amendment and that he believed he had a right to the rebates because Pride had always remitted them, indicates that his belief that he is entitled to the rebates is not grounded in the terms of the contract, but custom, and perhaps a misplaced trust. Because Sullo signed the First Amendment on behalf of Restaurant Supply, he is "presumed to have done so with knowledge of its contents, regardless of whether he actually read

it." <u>Sims v. Maison Ins. Co.</u>, 2016-1661 (La. App. 1 Cir. 9/15/17); 231 So.3d 656, 660. He is bound by the contract that he voluntarily and knowingly signed.

Restaurant Supply has failed to submit any competent evidence to controvert the foregoing. In its opposition, it largely either ignored the evidence Pride submitted, or made unsupported assertions that the evidence did not support a finding that the intent of the First Amendment was to change the status quo and give ownership of the rebates to Pride. Restaurant Supply submits three issues in an attempt to manufacture a disputed issue of fact as to the parties' intent in the adoption of the First Amendment. All must fail.

Restaurant Supply submits solicitation materials that Pride sent to potential new members in November 2015. The materials characterized Pride as "member-owned" and states that "All PRIDE revenues, after budgeted operated expenses, are returned to its dealer members via patronage dividend." Under a heading entitled "Discounts and Rebates," it states that "Rebates are disbursed rapidly via ACH wire transfer, with more than (14) rebate cycle payments during the past year, so you can gain use of your earned monies promptly. PRIDE does not hold your money!" Restaurant Supply states that Pride's claim that it does not hold Shareholder's money is evidence that neither Pride nor any of the Shareholders ever intended the First Amendment to shift ownership of the rebates to

Pride, and that Pride's interpretation of the rebates is "fabricated." But Pride's solicitations to potential Shareholders does not inform the parties' intent when adopting the First Amendment five years prior. First, the First Amendment was voluntary. Shareholders were not forced to sign it to maintain their membership, so it is not incorrect to state that the rebates belong to the Shareholders, because those who rejected the First Amendment and instead limited their purchases to the amount of their collateral maintained ownership of the rebates. Second, Section 10.2 of the By-Laws, discussed in detail below, still requires that Pride remit rebates when the revenues exceed expenses and losses. Pride is obligated to remit the rebates when due and owing. Accordingly, there is no indication that the Shareholders relied on any of these business solicitations when they adopted the First Amendment (or would believe that Pride intended to give ownership of the rebates to the Shareholders based on this information).

Next, Restaurant Supply submits an email from Karin Sugarman sent on November 2, 2010, about a week after the Shareholder Meeting. The email was sent to Pride Shareholders that had not yet signed the First Amendment. It encouraged them to execute the agreement and advised them on the credit consequences if they did not sign it. Specifically, it stated:

Dear PRIDE Member,

The PRIDE shareholders adopted the First Amendment to the Amendment and Restated Shareholder Agreement at the meeting on October 26, 2010. This amendment allows PRIDE to continue to use the calculation of future rebates earned on current purchases to extend credit to a shareholder beyond the face value of that shareholder's letter of credit or certificate of deposit.

The First Amendment protects the interest of PRIDE, and at the same time allows the Shareholders the enhanced ability to effect product purchases with Authorization Code purchases. By signing the Amendment, a shareholder will be able to continue to use rebates that will be collected by PRIDE in the future as additional collateral for current procurement credit.

A shareholder may elect to not sign the Amendment. However, such election will result in PRIDE limiting the issuance of credit for procurement vendor purchases to the face amount of that shareholder's letter of credit or other security.

In order to continue the current method of credit calculation, please sign the attached amendment under the notary's signature and return the original document no later than Monday, November 15, 2010 . . . .

Pride contends that Sugarman's repeated statements that by signing the First Amendment, the Shareholder can continue to use rebates as collateral—the credit calculation method utilized at that time—is an admission that the First Amendment was simply maintaining the status quo. But nothing in this letter suggests that the First Amendment was not intended to change the ownership of the rebates. The credit calculation method in place in 2010 exposed Pride to losses because the Shareholders used rebates as collateral. If the Shareholder went bankrupt, Pride may not be able to actually use those rebates as collateral for any unpaid debts because Pride

only had a security interest in them and other creditors may have priority. The letter simply explains that if a Shareholder wanted to continue to make purchases above its letter of credit or security, it had to adopt the First Amendment. If it was comfortable limiting its purchases to that amount, it could forego signing the First Amendment. The letter clarifies the credit implications of choosing to adopt or reject the First Amendment. It does not create a fact issue as to the intent of the parties.

Last, Restaurant Supply submits its expert report on Pride's 2016 tax return. In Pride's 2016 Tax Return, under the category of Other Income, Pride lists "Debt Forgiveness Income- 2015 Rebates" to describe $34.4 million dollars in "income" it received. Pride's expert, Charles Theriot, opines in his report that had Pride actually owned the rebates, it would not have characterized them as debt. The tax return does not provide any additional information as to its characterization of the rebates as debt, and Theriot's opinion is solely based on the use of the word "debt" in that singular instance. Restaurant Supply contends that Pride is bound by its representations on its tax returns, and that this is evidence that it never actually owned the rebates as it now claims.

Competent evidence that Pride and the Shareholders did not intend the First Amendment to vest ownership of the rebates in Pride would create a factual controversy and therefore render summary judgment inappropriate. However, there must be an "actual

controversy." <u>Little</u>, 37 F.3d at 1075 (citations omitted). The nonmoving party cannot satisfy its burden by presenting "a scintilla of evidence." <u>Id.</u> Instead, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" <u>Id.</u> (quoting <u>Armstrong v. City of Dallas</u>, 997 F.2d 62, 67 (5th Cir. 1993)). Moreover, a district court has "somewhat greater discretion" to determine the probative value of evidence in a bench trial, as is the case here, rather than a jury trial. <u>Matter of Placid Oil Co.</u>, 932 F.2d 394, 397 (5th Cir. 1991). In instances where "there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved." <u>Nunez v. Superior Oil Co.</u>, 572 F.2d 1119, 1123-24 (5th Cir. 1978). In fact, where "[a] trial on the merits would reveal no additional data" and would not aid the judge in making a determination on credibility, "[t]he judge . . . ought to draw his inferences without resort to the expense of trial." <u>Id.</u> at 1124.

Restaurant Supply's evidence that Pride's 2016 tax return briefly references rebates as debt is insufficient to create a factual controversy as to the intent of the parties when adopting the First Amendment. The tax return did not elaborate on the

characterization of the rebates, and did not provide any other information that would indicate that Pride did not own them. It was filed seven years after the parties adopted the amendment, and in these circumstances, cannot be said to speak to the intent of the parties when adopting a contract years prior. Moreover, as this Court has noted in prior decisions, federal tax documents do not control state law-governed contracts. At best they inform the context of the contract, and here, the 2016 tax return does not even do that. One phrase used in a tax document prepared to satisfy federal laws and regulations can hardly be said, in this context and without any additional support, to amount to evidence that the Shareholders intended to maintain ownership of the rebates. Restaurant Supply parsed years of financial documents, and the only potentially contradictory information it could identify was a singular phrase from a tax return submitted years later. The Court will not accept Restaurant Supply's attempt to create an issue of fact. Restaurant Supply did not submit evidence that calls into question the credibility of the several witnesses that testified that the First Amendment was unequivocally intended to give Pride ownership of the rebates. In the extensive record presented to the Court, in regards to the meaning of the First Amendment and the circumstances surrounding its adoption, Restaurant Supply does not submit any evidence to indicate that a trial on the merits of this issue will give the Court greater

clarity of the intent of the parties. Given the Court's heightened ability to give weight to the proffered evidence (as this case is set for a bench trial), the voluminous record that both parties have produced, and the completeness of the factual record presented to the Court (as it pertains to this issue), there is no material issue of fact as to the intent of the parties in the adoption of the First Amendment of the Shareholder Agreement. The First Amendment was executed for the purpose of vesting the ownership of the rebates in Pride.

D.

When the Court first considered whether Section 3.02(B) was included in the First Amendment, in ruling on Pride's Rule 12(c) motion, the Court was limited to the four corners of the agreement. Although Section 9.01 explicitly vested the ownership of the rebates in Pride, the construction of the document prompted the Court to determine that Section 3.02(B), which vests a security interest in Pride, was included in the First Amendment. Because Pride would not have a security interest and ownership of the rebates, the Court found that the parties' intent in drafting the First Amendment was ambiguous. But the Court's inquiry into the parties' intent has allowed it to view extrinsic evidence, and it has determined that the explicit purpose of the First Amendment was to give Pride complete ownership in the rebates. This greater understanding of the intent of the parties provides clarity as to

the rest of the First Amendment. Section 3.02(B) could not have been intended to be included in the First Amendment. The Court determined that the provision was included because excluding it would allow inconsistent formatting and because Section 3.02 did not explicitly state the section was being deleted. Both reasons pale in consideration of the language of Section 9.01 which undoubtedly vests ownership of the rebates in Pride, and the overwhelming record evidence that the purpose of the First Amendment was to do just that. The context in which the Court first considered whether Section 3.02(B) was included in the First Amendment was necessarily divorced from context now of record. In engaging in the inquiry that the law mandates, the Court has determined that the parties did not intend to include Section 3.02(B) into the First Amendment, and instead, intended Section 9.01 to govern the ownership interest in the rebates. The First Amendment, as a whole, on the record as it has been developed, unambiguously gives Pride ownership of the rebates. Restaurant Supply has no basis for claiming ownership based on the Shareholder Agreement and the First Amendment.

III.

Even though Restaurant Supply does not own the rebates under the Shareholder Agreement and First Amendment, it may still have a right to the rebates under Section 10.2 of Pride's By-Laws. In

its Order and Reasons denying Restaurant Supply's motion for partial summary judgment,[10] the Court held that Section 10.2 obligates Pride to pay its Shareholders patronage dividends that result from "net savings," including rebates.[11] See <u>Order and</u> <u>Reasons</u> (dtd. 6/27/18). However, the Court held that Pride was not required to pay all rebates, but rather rebates of revenues less expenses and loss. Pride had submitted evidence that its losses for guaranteeing FSW's loan were so substantial that it did not have net savings in 2015 or the beginning of 2016. Specifically, the FSW loans, which is an administrating and operating expense

---

[10] Restaurant Supply moved for summary judgment on the issue of breach of contract. It contended that because Section 10.2 required that Pride remit, on a patronage basis, all net savings, that necessarily required it to remit all rebates. The Court disagreed.

[11] Section 10.2 of Article X provides:

> **There shall be distributed, on a patronage basis to such Shareholders of the Corporation** in a manner taking into account the amount of business done by the Corporation with each of them, **all the net savings** and overcharges effected by or resulting from the operations conducted and carried on by the corporation in connection with the sale of equipment and supplies made by the corporation to such Shareholders for resale by them **which remain after paying all operating and administrative expenses of the corporation** and all interest on its indebtedness and after the setting aside by the Directors of such reasonable reserves as they shall determine from time-to-time to be appropriate for the purpose of providing for the expectancy of PRIDE and for the purpose of providing for the expectancy of any losses or contingencies. Said distributions shall be made no later than eight and one half (8 1/2) months following the close of the year of the Corporation during which the patronage occurred with respect to which each such distribution is made. . . ."

(Emphasis added).

according to Pride, exceeded the amount of revenue Pride had available in February and March 2016 after the Iberia sweep.[12] Restaurant Supply did not submit any evidence to counter that. The Court denied the motion because Restaurant Supply had not shown that Pride was contractually obligated to remit the rebates after net savings were calculated.

However, in its opposition to this motion, Restaurant Supply submitted evidence that Pride remitted rebates to other Shareholders in April 2016. Restaurant Supply contends that it was entitled to a distribution under Section 10.2, and that because Pride made a distribution to other Shareholders, Pride owes Restaurant Supply its rebates. It asserts that Pride withheld the rebates from Restaurant Supply out of spite because it terminated its membership. Pride disagrees. Pride contends that it did not have net earnings in March, and by the time it did have the ability to make a distribution in April, Restaurant Supply had terminated its membership. Pride contends that the By-Laws make clear that

---

[12] According to the accounting information presented in Pride's expert report, Pride had $15.4 million in excess losses allocated to the general pool in 2015. Pride allocated this loss to vendor rebate pools in 2016. Pride applies this loss to the rebates generated by the manufacturers and vendors based on the purchases made by the Shareholder patrons. An explanation of Pride's accounting processes is provided in this Court's Order and Reasons, dated 6/27/18 (denying Restaurant Supply's motion for partial summary judgment).

Pride is not obligated to make distributions to Shareholders that are no longer members.

First, the Court must consider when Pride had the financial ability to distribute earnings. A review of the record evidence addressing Pride's financial position in March and April is necessary. On March 15, 2016, a few days after the sweep, Iberia and Pride executed an agreement. They agreed that Pride would deposit all incoming rebate funds into an Iberia account that Pride could not have access to, and the amounts would be transferred into an escrow account. At Pride's request, Iberia would transfer fifty percent of each deposit into Pride's operating account. This would continue until the escrow account had $3.5 million in deposits, the remaining amount owed for the guaranty of FSW's loans. Accordingly, as Pride began to receive the rebates it regularly accepted from its vendors, it would receive about half of those amounts in its operating account. Pride began accruing funds in its operating account immediately. Restaurant Supply submits notes taken by Demetre Selevredes, a Pride Board member, during a Pride Board meeting with took place on March 22, 2016. In taking the notes, Selevredes appeared to have written the name of the person speaking on the left, and paraphrased what he said. The notes are cryptic and incomplete. However, they do indicate that Pride planned to make a rebate distribution, and had recouped some funds in its operating account in March. Specifically, it states:

```
SCOTT G-   DECLINES OFFER
           LANDED ON #1 - HAPPY ABOUT THAT
           HAS ISQ3 BEEN BAD (LOUIS- YES)[13]
           **DISTRIBUTION OF REBATES?**
           **REBATE ESCROW <u>NOW</u> @ $728K**
           **OPERATING ACCOUNT @ $1 MM**
           **PROC ACCT @ $300K**

RA-        10-12% PAID OUT NOW, BA WHEN REBATES COME COME IN.

LOUIS-     DO WE PAY I5Q4 IN FOUR.

JAY-       YES

ME-        YES

JAY-       IF BANK MTG GOES BAD, THEN WHAT

JAY-       **DO WE WANT TO HOLD SOME REBATES FOR THOSE WHO LEFT**

ME-        **NO**
           **PRIDE OWNS REBATES, "THEIR" $ MONEY WILL BE KEPT**
           **AND SHARED WITH THOSE WHO STUCK IT OUT!**

           **ALL AGREED**
```

(Emphasis added). On April 4, 2016, notes from a Pride Directors meeting indicate that Pride would have about $600,000 to distribute to Shareholders. The distribution was intended to prevent the Shareholders from making a "mass exodus." According to an email sent by a Pride Director, Pride had $1.1 million in its operating account on April 6, 2016, and planned to distribute $650,000 to Shareholders. But Pride still owed Iberia $1.9 million on its FSW

---

[13] It is unclear what this line, or the two proceeding lines, were referring to. The two people speaking before appeared to be discussing who should replace certain Board members who have left. The notes from the four speakers before them are redacted.

guarantee. The next day it had around $1.5 million, and planned to distribute $950,000. It remitted rebates to Shareholders that were currently members later in April.

While acknowledging that Pride distributed rebates in April, Pride maintains that its losses exceeded revenues in March, and its abstention from remitting rebates was authorized under Section 10.2. Restaurant Supply has not submitted any evidence to the contrary. Although Selevredes's notes indicate that Pride had some money, it clearly reflects less than the amount Pride owed Iberia. However, Restaurant Supply does assert that as of April 4, Pride was able to make distributions. Restaurant Supply bases this from the Board meeting minutes, where the Directors discuss distributing $600,000. But Pride still owed Iberia nearly $2 million, which exceeded its operating account, suggesting that it did not have net earnings. Neither party submits evidence that states when Pride satisfied its debt to Iberia, or at what point in April or May 2016, if ever, it had net earnings.[14] On the record before the Court, the only conclusion is that there is a fact issue as to whether Pride had sufficient revenue to make a patronage dividend in April.[15] To the extent that Pride's willingness to make

---

[14] The exact date in which the April distributions were made is also unclear.

[15] Without clarity as to Pride's financial position during this time, and briefing as to Pride's obligation under Section 10.2 in regards to the required timing of the rebates, the Court cannot determine what Pride's obligations were during that time.

a distribution creates a fact issue that Pride was obligated to distribute rebates in April because it had net earnings, the earliest Pride could have possibly had the obligation, based on the record, would be April 4, 2016.

B.

The import of this material fact issue is dependent on whether Restaurant Supply was entitled to receive rebates after its membership terminated, and when its membership terminated. Pride contends that Restaurant Supply's membership terminated on March 22, 2016. Pride urges that once it was terminated, Restaurant Supply lost the right to patronage dividends, so even if Pride was required to make a distribution in April, Restaurant Supply was not entitled to it. Restaurant Supply counters that it was not terminated until May 20, 2016, and that Pride's obligation to make a distribution survived termination.

Some facts surrounding the events leadings to Restaurant Supply's membership termination are in part undisputed. One of Pride's competitor buying groups, SEGA, offered Restaurant Supply membership on March 21, 2016, a few days after Pride announced that it would not pay the rebates because of the FSW guaranty, and Restaurant Supply accepted the same day. But SEFA required Restaurant Supply to resign from Pride, as it did not allow its members to belong to other buying groups. In its acceptance letter, Joseph Sullo stated that he did not want to resign from Pride

because it could "be detrimental to the legal interests" of Restaurant Supply, but that he nevertheless promised to use SEFA exclusively. The next day, March 22, 2016, he sent Pride a letter where he stated that he would "cease purchasing products through Pride." He also stated that "[w]hat has happened here is a tragedy for the wonderful buying group" and that "I hope this can turn around for everyone." Sullo did not mention that he joined SEFA. Robert Autenrieth, the Pride Board member who received the letter, forwarded it to the rest of the Board the next day, characterizing it as an "effective resignation," and stating that Restaurant Supply is "going to SEFA." Additionally, in a letter dated March 21, 2016, Restaurant Supply sent correspondence to Pride's CFO stating that because Pride had not paid Restaurant Supply its rebates, it was terminating Pride's access to collateral that was required of all members by the Shareholder Agreement.

But the Shareholder Agreement provides that a Shareholder is in default if its conduct is deemed by the Board of Directors to be "detrimental to the best interest" of Pride. The remedy for a Shareholder in default is the cancellation of the shareholder's membership interest. It is undisputed that the Pride Board of Directors were within their discretion to find that Restaurant Supply's conduct in ceasing to participate in purchases through Pride, joining a competitor group, and cancelling the required collateral was not in the best interest of Pride and warranted

default and therefore cancellation. However, the date in which Pride was terminated is indeed disputed. According to the meeting minutes, the Pride Board of Directors voted to "expel" Restaurant Supply as a Shareholder on May 12, 2018. They voted nine to one in favor of termination. The meeting minutes reflect that Restaurant Supply's termination "relat[es] back to the date of its letter advising of the withdrawal of all purchasing through Pride," meaning that Restaurant Supply's termination is effective March 22, 2016. However, Pride did not notify Restaurant Supply of its termination until May 20, 2016. In its email to Joseph Sullo, Cathy Ellickson, Pride's Chief Operating Officer, states that "the Board of Directors has voted to terminate and remove Restaurant Supply, LLC ("Restaurant Supply") as a Shareholder of PRIDE, **effective May 20, 2016 at 5:30 CST.**" (Emphasis added). Accordingly, an issue of fact exists as to when Restaurant Supply's membership in Pride was effectively cancelled.

C.

The timing of Restaurant Supply's termination is only a *material* issue of fact if cancellation withdraws Restaurant Supply's entitlement to the April distribution of rebates. If, as Restaurant Supply contends, a Shareholder is still entitled to the patronage dividends after its termination, it wouldn't matter if Restaurant Supply was terminated in March or May. But the By-Laws say differently.

A Shareholder's rights depend on whether the distribution was due and owing. Pride was not obligated to pay patronage dividends in March 2016 because it did not have net earnings. If it is determined that Pride was obligated pay patronage dividends in April 2016, it would only be obligated to pay its current Shareholders. If Restaurant Supply's membership terminated in March, as Pride contends, Restaurant Supply would not have a right to future patronage dividends. Section 10.2 provides that "There shall be distributed, on a patronage basis to such *Shareholders* of the Corporation . . . ."[16] Only current Shareholders are entitled to distributions. However, if Pride was obligated to pay patronage dividends in April 2016, and Restaurant Supply was still a Shareholder, nothing in Pride's corporate governance documents allows it to skip its obligations.[17]

The determination of whether Pride was obligated to pay Restaurant Supply rebates depends on whether Pride was obligated to pay any Shareholder rebates in April and May 2016, and whether Pride was still a Shareholder during those months, both outstanding issues of fact. The Court therefore cannot grant summary judgment

---

[16] Notably, Section 10.2 does not distinguish between Shareholders in good standing or Shareholders in default. As far as the Court is aware, the Shareholder only loses its right to distributions once its membership is cancelled, because that is the point the entity is no longer a Shareholder.

[17] Restaurant Supply, if it was still a Shareholder in April 2016, may be entitled to patronage dividends only to the extent that Pride was obligated to distribute them under Section 10.2.

on the issue of whether Restaurant Supply has any valid claim to the rebates because issues of fact remain as to its claim under Section 10.2.

IV.

Thus far, the Court has only considered Restaurant Supply's grounds for relief under the corporate governance documents. Now, it must apply its findings to its actual claims. Still before the Court are five claims: (1) equitable accounting; (2) conversion; (3) breach of contract; (4) breach of fiduciary duty and the duty of loyalty; (5) negligence.

The first count of Restaurant Supply's Restated and Amended Complaint is "Equitable Accounting." Restaurant Supply specifies that it "seeks an accounting for the sums due it from Pride both as its agent and otherwise and a judgment for payment of said sums." The Fifth Circuit has defined equitable accounting as "the means by which the value of th[e] damages may be calculated." Garcia v. Koch Oil Co. of Texas, Inc., 351 F.3d 636, 640 (5th Cir. 2003). It allows the plaintiff to shift the burden of discovery to the defendants. Id. at 401. The voluminous record and the active motion practice make clear that both parties have heavily participated in discovery and in parsing the financial documents related to the rebates. Moreover, the Magistrate Judge ordered Pride to produce audited financial statements from 2015 and 2016

42

and its original tax return for 2015. Restaurant Supply has not mentioned this cause of action in any of its subsequent motions or replies, let alone submit any evidence as to why it is entitled to relief from its burden of calculating its damages. Because it has wholly failed to submit any evidence in regards to its claim for equitable accounting, Pride is entitled to summary judgment.

Conversion is "an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time." Quealey v. Paine, Webber, Jackson & Curtis, Inc., 475 So.2d 756, 760 (La. 1985). A successful claim for conversion requires the plaintiff to have "possessory rights." See Importsales, Inc. v. Lindeman, 92 So.2d 574, 575 (La. 1957). Because there is an issue of fact as to whether Restaurant Supply had a right to rebates under Section 10.2, the Court cannot determine its claim to conversion.

Likewise, a determination of Restaurant Supply's breach of contract claim is inappropriate on this record. Section 9.1 of the By-laws provides that "[t]hese by-laws . . . shall constitute a binding contract between the corporation and its Shareholders." There is a factual dispute as to whether Pride breached its obligations to distribute patronage dividends under Section 10.2 of Article X of the By-Laws.

Restaurant Supply also claims that Pride breached its fiduciary duty and duty of loyalty by pledging its rebates. Pride contends that it does not have a fiduciary relationship with Restaurant Supply, and even if it does, it did not violate its duties because Restaurant Supply does not own the rebates. But because it (appropriately) dedicated its motion to addressing whether Pride had any ownership rights, it only very briefly addressed the issue of fiduciary duty. Restaurant Supply addressed it with even less specificity. Likewise, Pride only dedicated a few sentences to the negligence claim, and Restaurant Supply did not reach the issue. Because the issues were not adequately briefed, the Court will not reach the merits of these issue.

Accordingly, IT IS ORDERED: that the defendant's motion for summary judgment is GRANTED as to the plaintiff's claim for equitable accounting, DENIED as to its claims for conversion and breach of contract, and DENIED as to its claims for fiduciary duty and the duty of loyalty, and negligence.

New Orleans, Louisiana, August 22, 2018

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE