UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RESTAURANT SUPPLY, LLC                          CIVIL ACTION

V.                                              NO. 17-8793

PRIDE MARKETING AND                             SECTION "F"
PROCUREMENT, INC.

<u>ORDER AND REASONS</u>

Before the Court are two motions: (1) the plaintiff's motion
to reconsider two findings made in the Court's Order and Reasons
dated August 22, 2018, in which the Court granted in part the
defendant's motion for partial summary judgment, dismissing the
plaintiff's equitable accounting claim; and (2) the defendant's
motion for partial summary judgment, seeking partial dismissal of
the remaining claims, except with respect to patronage
distributions made between March 21, 2016 and May 20, 2016, to
which the plaintiff may be entitled. For the following reasons,
the plaintiff's motion is GRANTED in part, and the Court now finds
that there is a genuine factual dispute as to the ownership of
rebates; and the defendant's motion is DENIED as moot.

**Background**

This lawsuit arises from a dispute over whether a shareholder
is entitled to distributions of rebates from a restaurant equipment
cooperative.

1

Pride Centric Resources, Inc. (formerly known as Pride Marketing & Procurement, Inc.) is a cooperative of food service wholesale suppliers and dealers engaged in the business of buying and selling food service supplies and equipment products. Each supplier and dealer owns one share in the buying group. Pride uses the collective purchasing strength of its Shareholders to negotiate advantageous pricing from food service suppliers and equipment manufacturers, referred to as Pride Vendors. Organized as a cooperative for tax purposes, Pride would receive rebates from manufacturers when its Shareholder patrons exceeded certain purchasing minimums set by the manufacturer. Typically, Pride would redistribute the rebates, also referred to as patronage dividends, to the Shareholders in the amount that each one earned. Pride is obligated by its By-Laws to remit rebates less expenses and losses to its Shareholders.

In March 2016, Pride informed its Shareholders that it could not pay rebates for 2015 and 2016 because it had sustained significant losses after guaranteeing the debt of FoodServiceWarehouse.com.[1] FSW established a $2 million line of

---

[1] FSW was formed in 2006 as an internet-based e-commerce business that purchased bulk food service equipment and supplies, stored the inventory, and then distributed it to retail internet buyers. Pride Shareholders voted to form FSW because many of the shareholders operated physical storefronts and could not capture internet sales. At formation, all Pride Shareholders became members of FSW. Additionally, FSW became a member of Pride. This benefited Pride Shareholders because FSW's substantial purchasing

credit from Iberia Bank in August 2012 and increased the line to $21 million over a three year period. With the approval of its Board of Directors, Pride guaranteed FSW's line of credit for $15 million. Simultaneously, FSW was seeking a larger debt instrument from JP Morgan Chase, which was intended to continue to fund FSW's expansion and satisfy the Iberia line of credit. However, in February 2016, FSW members were notified that this funding was delayed and that the JP Morgan debt instrument would not be accessible until April 2016, at the earliest. In late February 2016, Pride made a $4 million payment to Iberia Bank in an attempt to provide FSW with additional time to work through some of its issues. Weeks later, Iberia swept Pride's bank accounts, taking all of the funds therein, including Pride's operating, rebate, and procurement funds, totaling $9.8 million. On March 11, 2016, Iberia issued a Notice of Default of FSW and accelerated the remaining debt due. Pride immediately paid $4 million to extinguish and satisfy its guaranty of the FSW debt. On May 20, 2016, FSW filed Chapter 11 Bankruptcy.

Immediately after the Iberia sweep, the Pride Board of Directors informed Shareholders that they would not be receiving payments of the remaining 2015 rebates but that Pride intended to

---

volume allows Pride to negotiate better contracts with vendors, resulting in more favorable pricing.

pay these rebates in the future. In response, on March 21, 2016, Restaurant Supply, which had been a Shareholder of Pride since 2006, sent a letter to Pride demanding all rebates "due and owing." Specifically, Restaurant Supply asserted a right to $2 million in rebates it had accrued from its purchases in 2015 and 2016. In addition, Restaurant Supply stated that it would be "ceasing all purchasing procurements through PRIDE," effective immediately. Shortly thereafter, the Pride Board learned that Restaurant Supply had joined a competitive buying group. Deciding that Restaurant Supply's decision to cease purchasing and join a competitor would be detrimental to Pride's interest, the Pride Board voted to terminate Restaurant Supply's interest in Pride on May 20, 2016, thereby withdrawing its status as Shareholder.

Restaurant Supply initially sued Pride in Connecticut state court on June 28, 2016, seeking to recover the $2 million in rebates Pride refused to remit. The case was removed to the United States District Court for the District of Connecticut and then transferred to this Court on August 31, 2017. In its amended complaint, Restaurant Supply alleged the following causes of action: (1) equitable accounting; (2) conversion; (3) unjust enrichment; (4) breach of fiduciary duty and the duty of loyalty; (5) breach of contract; and (6) negligence. In its April 25, 2018 Order and Reasons, this Court granted Pride's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c) as to the unjust

enrichment claim, and denied the motion as to all other claims. On June 27, 2018, the Court denied Restaurant Supply's motion for partial summary judgment on its breach of contract claim and denied Pride's motion for sanctions under Rule 37, or in the alternative, motion for partial summary judgment.

Most recently, in its August 22, 2018 Order and Reasons, the Court granted Pride's motion for summary judgment in part, as to the plaintiff's claim for equitable accounting, and denied the motion as to the remaining claims. In considering the motion, the Court reiterated that there were two potential theories under which Restaurant Supply could demonstrate its entitlement to the rebates Pride refused to remit: (1) the Shareholder Agreement and the First Amendment and (2) the By-Laws.

First, in looking to the four corners of the Shareholder Agreement, as amended, the Court found that Section 9.01 explicitly vested ownership of the rebates in Pride, while Section 3.02(B) vested a security interest in Pride. Because Pride would not have a security interest and ownership of the rebates, the Court determined that the Agreement was "hopelessly ambiguous." As such, in accordance with principles of contract interpretation under Louisiana law, the Court looked to extrinsic evidence to determine the parties' intent in adopting the First Amendment – namely, whether they intended for ownership of rebates to be governed by Section 9.01 or Section 3.02(B). In so doing, the Court stated

that Pride had submitted substantial evidence supporting its contention that the First Amendment was intended to unequivocally vest ownership of the rebates in Pride, and that Restaurant Supply had failed to submit any competent evidence to show otherwise. The Court explained that Pride submitted evidence of an email dated October 12, 2010, in which Pride announced the First Amendment and its purpose to Shareholders as follows:

> [I]f PRIDE is to continue to issue Authorization Approval Codes based upon vendor rebates it will have to be explicitly clear that the vendor rebates are the exclusive property and funds of PRIDE, with the Shareholders to have no legal, equitable, or any other interest or claim whatsoever in the rebate.

Pride also submitted the deposition testimony of its CEO, Karin Sugarman, in which she testified that the First Amendment reflected Pride's need "to own th[e] rebates." The Court further noted that Pride submitted affidavits of the representatives of four Shareholders, who attested that they understood from the language of the First Amendment that Pride would own the rebates. After considering this evidence, the Court determined that both Pride and the Shareholders understood that the First Amendment was intended to vest ownership of the rebates in Pride. The Court went on to conclude that the evidence submitted by Restaurant Supply in an attempt to contradict Pride's evidence as to the

parties' intent failed to do so.[2]  Accordingly, the Court concluded

that the First Amendment unambiguously gave Pride ownership of the

rebates.

The Court next found that, even though Restaurant Supply did

not own the rebates under the Shareholder Agreement and First

Amendment, it may still have a right to the rebates under Section

10.2 of the By-Laws.  Referencing the findings from its June 27,

2018 Order and Reasons, the Court explained that Section 10.2

obligates Pride to pay its Shareholders patronage dividends that

result from "net savings."[3]  And on the record before the Court,

[2] In particular, the Court determined that Pride's solicitation
materials sent to potential new members in 2015, in which Pride
stated that it did not hold Shareholders' money, did not indicate
that Pride intended for Shareholders to own the rebates.  This
language could be explained by Section 10.02 of the By-Laws, which
required Pride to remit distributions to Shareholders when due and
owing.
    Second, Karin Sugarman's email encouraging Shareholders to
sign the First Amendment likewise did not evidence an intent that
the Shareholders would retain ownership of the rebates; rather, it
clarified the credit consequences of choosing to adopt or reject
the Amendment.
    Finally, the Court noted that Restaurant Supply's expert
report on one phrase in Pride's 2016 tax return regarding "debt
forgiveness" did not amount to evidence that the Shareholders
intended to maintain ownership of the rebates.  Finding that
Restaurant Supply submitted no evidence to indicate that a trial
on the merits of this issue would give the Court greater clarity
of the parties' intent, the Court determined there was no material
issue of fact that the First Amendment was executed for the purpose
of vesting ownership of the rebates in Pride.
[3] Although rebates are included in this calculation, the Court
noted, Pride was not required to pay all rebates, but rather,
rebates of revenues less expenses and losses.  Accordingly, the
Court stated that Restaurant Supply's entitlement to rebates under

there was a fact issue as to whether Pride had sufficient revenue to make a patronage distribution in April of 2016.

However, the Court clarified that the import of this fact issue depended on: (1) whether Restaurant Supply was entitled to receive rebates after its membership terminated, and (2) when its membership terminated. The Court determined that a fact issue existed as to when Restaurant Supply's membership in Pride was effectively canceled. It then then concluded that, pursuant to Section 10.2 of the By-Laws, only current Shareholders are entitled to distributions.[4] However, it also explained that if Pride was obligated to pay patronage dividends in April 2016, and Restaurant Supply was still a Shareholder at that time, nothing in Pride's corporate governance documents would allow Pride to skip its obligation. Ultimately, the Court stated, the determination of whether Pride was obligated to pay Restaurant Supply rebates depended on whether Pride was obligated to pay any Shareholder rebates in April and May of 2016, and if so, whether Pride was still a Shareholder during those months, both outstanding issues of fact. Thus, the Court concluded that it could not grant summary

_____

Section 10.2 depended on whether Pride had the financial ability to distribute earnings.

[4] Section 10.2 of Pride's By-Laws provides that "[t]here shall be distributed, on a patronage basis to such *Shareholders* of the Corporation . . . ." (emphasis added).

judgment on the issue of whether Restaurant Supply had a valid claim to the rebates under Section 10.2.

Finally, the Court applied its findings to Restaurant Supply's claims still before the Court. It concluded that Pride was entitled to summary judgment dismissing the equitable accounting claim but that issues of fact regarding Restaurant Supply's right to rebates under Section 10.2 precluded summary judgment as to the conversion and breach of contract claims. Finally, the Court concluded that summary judgment was premature as to the breach of fiduciary duty and duty of loyalty claims, as well as the negligence claim, in light of inadequate briefing.

Restaurant Supply now moves for reconsideration of the Court's findings that: (1) the First Amendment to the Shareholder Agreement vests ownership of the rebates in the Pride; and (2) the By-Laws provide that a Shareholder's right to rebates terminates when it ceases to be a Shareholder. And Pride moves for partial summary judgment, seeking partial dismissal of the plaintiff's remaining claims, except with respect to patronage distributions made between March 21, 2016 and May 20, 2016, to which Restaurant Supply may be entitled.

I.

*A.*

Motions requesting reconsideration of court orders generally fall under Rule 54(b), Rule 59(e), or Rule 60(b) of the Federal

Rules of Civil Procedure. See <u>Higgins v. Cain</u>, No. 07-9729, 2012 WL 3309716, at *1 (E.D. La. Aug. 13, 2012); <u>Waste Mgmt. of La., Inc. v. River Birch, Inc.</u>, No. 11-2405, 2012 WL 876717, at *1 (E.D. La. Mar. 14, 2012); <u>Castrillo v. Am. Home Mortg. Servicing, Inc.</u>, No. 09-4369, 2010 WL 1424398, at *3-4 (E.D. La. Apr. 5, 2010). Rule 59(e) provides that a motion to alter or amend a judgment must be filed no later than twenty-eight days after the entry of judgment. Fed. R. Civ. P. 59(e). Rule 60(b), on the other hand, applies to motions filed after the twenty-eight day period, but demands more "exacting substantive requirements." See <u>Lavespere v. Niagara Mach. & Tool Works, Inc.</u>, 910 F.2d 167, 173-74 (5th Cir. 1990), abrogated on other grounds, <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1078 (5th Cir. 1994) (en banc).

Rules 59 and 60, however, apply only to final judgments. When a party seeks to revise an order that adjudicates fewer than all the claims among all of the parties, then Rule 54(b) controls. See Fed. R. Civ. P. 54(b). Because the Court's August 22, 2018 Order and Reasons constitutes an interlocutory order, rather than a final judgment, Rule 54(b) governs the plaintiff's motion for reconsideration.

Under Rule 54(b), the Court "is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." <u>Austin v. Kroger Tex.,</u>

10

L.P., 864 F.3d 326, 336 (5th Cir. 2017)(citing <u>Lavespere v. Niagara</u> <u>Mach. & Tool Works, Inc.</u>, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds*, <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994)(*en banc*)).  Compared to Rule 59(e),[5] "Rule 54(b)'s approach to the interlocutory presentation of new arguments as the case evolves [is] more flexible, reflecting the 'inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'"  <u>Id.</u> at 337 (quoting <u>Cobell v. Jewell</u>, 802 F.3d 12, 25-26 (D.C. Cir. 2015)(internal citations omitted)(quoting <u>Greene v. Union Mutual</u> <u>Life Ins. Co. of Am.</u>, 764 F.2d 19, 22 (1st Cir. 1985)(Breyer, J.)).

*B.*

Restaurant Supply first urges the Court to reconsider its finding that the First Amendment to the Shareholder Agreement vests ownership of the rebates in Pride.  The plaintiff contends that the Court made erroneous and unsupported factual findings because it (1) overlooked evidence the plaintiff had submitted in opposition to the defendant's motion, and (2) made credibility and factual determinations on disputed issues of fact.

---

[5] Rule 59(e) "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact to present newly discovered evidence," and it is "an extraordinary remedy that should be used sparingly."  <u>Austin</u>, 864 F.3d at 336 (quoting <u>Templet v. HydroChem</u> <u>Inc.</u>, 367 F.3d 473, 479 (5th Cir. 2004)).

Although Restaurant Supply concedes that a district court ruling on a motion for summary judgment in a case that will culminate in a bench trial has greater latitude as a finder of fact, it submits that this latitude does not extend to making inferences that "involve issues of witness credibility or disputed material facts." See Domino v. Allstate Ins. Co., No. 09-7348, 2010 WL 4066647, at *2 (E.D. La. La. Oct. 15, 2010) (Fallon, J.). Restaurant Supply also contends that, after characterizing the First Amendment as "hopelessly ambiguous," the Court erroneously focused solely on events prior to execution of the First Amendment and seemingly gave no weight to evidence of the parties' course of conduct before and after the adoption of the Amendment. According to the plaintiff, this "performance" is "clear, irrefutable evidence" that Pride never intended for the Amendment to vest ownership of the rebates in Pride.

Specifically, Restaurant Supply contends that the Court overlooked, or gave too little weight to, the following record evidence: (1) an email letter announcing the First Amendment to Shareholders; (2) expert testimony regarding Pride's practice of paying all rebates, without deduction, to Shareholders; (3) "debt forgiveness" reported on Pride's 2016 tax return; and (4) expert testimony opining that Pride treated the rebates as liabilities on its books and financial statements.

The plaintiff first alleges that the Court overlooked representations made by Pride in the initial email letter that announced the First Amendment to Shareholders. In this letter, the plaintiff contends, Pride stated that the Amendment would protect members from the potential bankruptcy of other members – not that it would permit Pride to invest rebates on behalf of some particular member. It is the plaintiff, however, who overlooks that Pride explicitly stated in this communication that "vendor rebates are the exclusive property and funds of PRIDE." The question before the Court is whether the parties intended for the First Amendment to vest "ownership" of the rebates in Pride; this email letter unambiguously answers that question in the affirmative.

Restaurant Supply next alleges that the Court overlooked that Pride's pre-2016 tax returns and financial statements reveal that it paid 100% of the rebates to Shareholders, without deducting any overhead or administrative expenses. However, the Court did indeed consider this evidence and stressed that the question before it was "whether Pride was legally obligated to remit rebates under the terms of the Shareholder Agreement and the First Amendment." In other words, Pride's practice of distributing all rebates to Shareholders did not establish Shareholders' entitlement to, or ownership of, such rebates.

The plaintiff also contends that the Court gave no apparent weight to its expert report on the "debt forgiveness" reported in Pride's 2016 tax return. According to Restaurant Supply, this evidence reveals that Pride reported $34 million worth of "debt forgiveness" to the IRS, and that "debt forgiveness" presupposes the existence of a debt or liability, rather than ownership. In a similar vein, Restaurant Supply submits that both parties' experts agree that Pride treated the rebates as liabilities on its books and financial statements. Restaurant Supply first points to the report of its accounting expert, Charles Theriot, who opined that Pride's classification of rebates as a liability in its financial statements supports a finding that Pride did not own them. After reviewing Pride's 2013 and 2014 audited financial statements, Theriot opined in his report:

> Had Pride and their independent auditors determined that the manufacturers' rebates earned on purchases made by, or for the benefit of, the Shareholders/Patrons were owned by Pride and not by the Shareholders/Patrons, there would have been no need for Pride's methodology utilized in accounting for balanced and offsetting "Procurement Revenues and Expenses," "Inventory" carrying values would have been substantially greater, and accounting for "deferred revenues" would have been unnecessary.

The plaintiff also notes that Pride's own accounting expert, Eric Kreinert, acknowledged in his deposition testimony that the rebates were classified as liabilities.

14

> **Q:** Okay.  So "Deferred Revenue-Rebates," that
> is listed as an account payable though, right,
> under a liability?
>
> **A.** It's not an account payable.  It is a
> current liability though.

Restaurant Supply contends that, because Pride represented in its
tax returns and financial statements that it did not own the
rebates, it is precluded under the doctrine of quasi-estoppel from
taking an inconsistent position now.

In this regard, Restaurant Supply's papers are persuasive.
In its Order and Reasons, the Court did consider Restaurant
Supply's expert report on Pride's 2016 tax return but noted that
"[t]he tax return does not provide any additional information as
to its characterization of the rebates as debt, and [the expert's]
opinion is solely based on the use of the word 'debt' in that
singular instance."  The Court also noted that "federal tax
documents do not control state-law governed contracts" and that
"[a]t best they inform the context of the contract."  Accordingly,
the Court concluded:

> One phrase used in a tax document prepared to
> satisfy federal laws and regulations can
> hardly be said, in this context and without
> any additional support, to amount to evidence
> that the Shareholders intended to maintain
> ownership of the rebates.

See Order and Reasons (dtd. 8/22/18).  However, after reviewing
Restaurant Supply's opposition papers and citations to record
evidence anew, the Court recognizes that it overlooked the

significance of Theriot's expert report and Kreinert's deposition testimony. Theriot's report opines that Pride's 2013 and 2014 financial statements reflect that Pride treated the rebates as if it did not own them, and therefore, did not pay taxes on them. And Kreinert conceded in his deposition testimony that the rebates were classified as a "current liability" in Pride's books.[6] Moreover, the doctrine of quasi-estoppel, which has been recognized by Fifth Circuit jurisprudence, "forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." See Davidson v. Davidson, 947 F.2d 1294, 1297 (5th Cir. 1991); see also In re Soule, No. 04-0914, 2004 WL 2314524, at *6 (E.D. La. Oct. 13, 2004) ("[A] party cannot accept the benefits of a transaction or statute and then subsequently take an inconsistent position to avoid the corresponding obligations or effects.").

Accordingly, the Court finds that the aforementioned representations made in Pride's financial statements do create disputed issues of fact. As such, the Court alters its finding on the issue of rebate ownership, now concluding that there is a material issue of fact as to the intent of the parties in adopting

---

[6] But not an account payable. A distinction that could become of interest at a trial on the merits.

the First Amendment.[7]  In reaching this contrary conclusion, the
Court emphasizes the low threshold for review under Rule 54(b);
the Court "is free to reconsider and reverse its decision for any
reason it deems sufficient." Austin, 864 F.3d at 336 (citations
omitted).

*C.*

Restaurant Supply next takes issue with the Court's finding
that the By-Laws provide that a Shareholder's right to rebates
terminates when it ceases to be a Shareholder.  In its Order and
Reasons, the Court determined that, under Section 10.2 of the By-
Laws, only current Shareholders are entitled to patronage
distributions.  Restaurant Supply contends that, in making this
determination, the Court overlooked the effect of Section 10.6.
According to the plaintiff, this Section "unquestionably obligates
Pride to pay patronage dividends to its terminated shareholders."
Pride counters that Section 10.6 does not obligate Pride to make
patronage distributions to *defaulted*, terminated Shareholders,
like Restaurant Supply.  According to Pride, before Section 10.6
is applicable, there must be a determination that a distribution
of patronage dividends to that canceled or terminated Shareholder

---

[7] The Court stops short of holding that Restaurant Supply owns the
rebates, merely finding that the plaintiff has created a genuine
factual dispute as to the parties' intent in adopting the First
Amendment.  And the Court again reiterates and emphasizes the
patent ambiguity of the First Amendment.

is "otherwise distributable." Pride submits that this determination is not limited to Article X, but rather, refers to any Section of the By-Laws. And according to Pride, Section 4 provides that a defaulting Shareholder is not entitled to receive any future distributions.

With respect to this issue, both parties misinterpret the Court's holding. Article X of the By-Laws, entitled "Patronage Dividends to Shareholders," governs the procedure for calculating and distributing patronage dividends. Section 10.2 of Article X provides:

> **There shall be distributed, on a patronage basis to such Shareholders of the Corporation** in a manner taking into account the amount of business done by the Corporation with each of them, **all the net savings** and overcharges effected by or resulting from the operations conducted and carried on by the corporation in connection with the sale of equipment and supplies made by the corporation to such Shareholders for resale by them **which remain after paying all operating and administrative expenses of the corporation** and all interest on its indebtedness and after the setting aside by the Directors of such reasonable reserves as they shall determine from time-to-time to be appropriate for the purpose of providing for the expectancy of PRIDE and for the purpose of providing for the expectancy of any losses or contingencies. Said distributions shall be made no later than eight and one half (8 1/2) months following the close of the year of the Corporation during which the patronage occurred with respect to which each such distribution is made. . . ."

(Emphasis added). The Court reiterated in its most recent Order and Reasons that, under Section 10.2, Pride is not obligated to pay all rebates, but rather, rebates of revenues less expenses and losses. Accordingly, when Pride's losses exceed its revenues (that is, when it has no net earnings), there is no obligation to pay patronage dividends under Section 10.2. Moreover, because Section 10.2 refers merely to "Shareholders," only current shareholders are entitled to distributions.

Section 10.6 of Article X provides:

> Notwithstanding any of the foregoing provisions, **the portion of any patronage dividends that would otherwise be distributable in cash under any provision of this Article X** to a Shareholder which has been canceled or terminated by any means or for any reason whatsoever prior to the time of distribution of such patronage dividends, shall be applied by the Corporation to the payment of any indebtedness owed to the Corporation by or on behalf of such Shareholder to the extent of such indebtedness instead of being distributed in cash, provided however, that an amount equal to 20% of the total patronage dividends distributable for the applicable year to any such Shareholder with respect to such Shareholders, patronage shall nevertheless be paid in cash within 8-1/2 months following the close of such year if a timely written request for the payment of such amount in cash is submitted to the Corporation by the canceled or terminated Shareholder.

(Emphasis added). According to Section 10.6, patronage dividends must be "distributable" in order for this Section to be applicable. However, contrary to Pride's assertion, this determination is

based upon Section 10.2 – not Article IV.  As such, where the Corporation has no net assets, there is no obligation under Section 10.2 to distribute dividends, and likewise, no corresponding obligation under Section 10.6 to distribute dividends to canceled or terminated Shareholders.

Restaurant Supply contends that the Court has injected a "temporal element" into Article X which does not exist and that its interpretation of Section 10.2 renders Section 10.6 meaningless.  The Court disagrees.  If a Shareholder is canceled or terminated *after* a dividend is distributable but *before* it is paid, that canceled or terminated Shareholder retains the right, under Section 10.6, to collect the dividend.  Accordingly, termination does not extinguish Pride's obligation to pay dividends that were "otherwise distributable" to a canceled or terminated Shareholder at the time its membership ceased, but rather, extinguishes the terminated Shareholder's right to future distributions.[8]

## II.

Pride moves for partial summary judgment, seeking partial dismissal of the plaintiff's negligence, breach of fiduciary duty, and breach of duty of loyalty claims, with prejudice, except with

---

[8] Contrary to Restaurant Supply's assertion, this interpretation is not inconsistent with the Court's prior finding that termination of a Shareholder's membership interest does not vitiate Pride's obligation to pay dividends to a former Shareholder.

respect to any patronage distributions made by Pride between March 21, 2016 and May 20, 2016, to which Restaurant Supply may be entitled. In particular, Pride contends that the plaintiff will not be able to establish a prima facie case for any of its remaining claims. Pride submits that the only allegations contained in Restaurant Supply's complaint are tied to its allegation that Pride was its agent with respect to rebates which it owned, and because the Court had held that Pride – not Restaurant Supply – owned the rebates, Pride had no duty to Restaurant Supply with respect thereto. Pride also contends that Restaurant Supply lacks standing to bring a breach of duty or negligence action with respect to anything other than any rebates it may be entitled to for the March 21 – May 20, 2016 time period. Finally, Pride argues, to the extent this Court determines that Restaurant Supply's negligence and breach of fiduciary duty and duty of loyalty claims are broader than as articulated in the complaint and that Restaurant Supply has standing to bring any such "broad" claims, its breach of duty and negligence claims fail because it is unable to establish essential elements of its claims – the existence of a duty and a breach of the duty.

Pride openly contends that all of the arguments in its motion are based upon the Court's "important conclusion" in its August 22, 2018 Order and Reasons that Pride owns the rebates. However, the Court has since granted, in part, Restaurant Supply's motion

for reconsideration and now finds that there is a genuine factual dispute as to the issue of rebate ownership. As such, Pride's motion for partial summary judgment is moot.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the plaintiff's motion for reconsideration is GRANTED in part; the Court reverses its finding that the defendant owns the rebates and now finds that there is a genuine factual dispute as to the issue of rebate ownership under the Shareholder Agreement, as amended by the First Amendment. IT IS FURTHER ORDERED: that the defendant's motion for partial summary judgment is DENIED as moot.

New Orleans, Louisiana, October 17, 2018

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE